## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANTHONY SINNOTT,

Plaintiff,

v.

CITY OF JOLIET AND ALAN
ROECHNER, INDIVIDUALLY,

Defendants.

Case No. 20-CV-7591

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Sinnott sues Defendants the City of Joliet and its former police chief, Alan Roechner, alleging that they discriminated against him because of his race and violated his First and Fourteenth Amendment rights when they refused to hire him for a police officer position. Defendants deny liability and move now for summary judgment [29]. For the reasons explained below, this Court grants in part and denies in part Defendants' motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made,

1

the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

As a preliminary matter, Defendants raise evidentiary objections regarding Plaintiff's response to Defendants' statement of facts and statement of additional facts. This Court maintains broad discretion to enforce the local rules governing summary judgment motions, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008), and addresses Defendants' evidentiary objections before turning to the facts of the case.

Defendants first ask this Court to deem admitted thirty-one of its statements of fact because Plaintiff's responses either fail to substantively respond to the fact, supplement but does not contradict the stated fact, or fail to cite to accurate portions of the record that establish supposed contradictory information. [72] at 2–4. This Court declines to strike these responses wholesale and will evaluate them on a case-by-case basis, as pertinent to the analysis. *See, e.g.*, *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1020 (N.D. Ill. 2018) ("Rather than attempt to winnow the voluminous statements to only material paragraphs in the abstract, the court . . . deems addressing materiality questions as they pertain to particular issues to be the better course because it may obviate the need to analyze each disputed paragraph.").

This Court likewise declines at the outset to deem admitted those of Plaintiff's responses which Defendants argue constitute improper objections based on speculation, hearsay, and stating a legal conclusion, because these can be evaluated on a case-by-case basis. *See* [72] at 4. This Court similarly can evaluate, on a case-by-case basis, Defendants' objections to Plaintiff's additional facts to which Defendants contend rely on large non-specific swaths of deposition testimony or inadmissible hearsay. [72] at 5–6.

Defendants next complain that Plaintiff's facts lump multiple facts together, and thus, that they should all be stricken and/or disregarded. This is unfounded. Nothing in Local Rule 56.1 instructs parties to include only one fact per paragraph. [72] at 5. Moreover, where Plaintiff includes multiple facts per paragraph such facts

"are logically grouped and the combinations make sense in context." *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *7 (N.D. Ill. Jan. 20, 2015).

The Court is similarly unpersuaded by Defendants' argument that Plaintiff's "sham affidavit" should be stricken. *See* [72] at 6–7. The sham affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Although Defendants' argument remains unclear on this issue, they appear to suggest that one assertion in Plaintiff's affidavit contradicts a portion of his deposition testimony. Specifically, Plaintiff in his affidavit states that, at an event at a Joliet high school between fall 2018 and March 2019, he heard Defendant Roechner say to the officer standing next to him "that he did not want another Black male so that they [the Joliet Police Department] could have another member of the BPOA [Black Police Officer's Association]." [49-16] ¶¶ 3, 5. Defendants contend this assertion is inconsistent with Plaintiff's deposition testimony, where Plaintiff testified that he overheard Roechner say "that he was not going to hire another Sinnott and not going to have another police officer be part of the BPOA." [71-2] at 2. This Court does not see how this testimony is inconsistent with Plaintiff's affidavit. True, Plaintiff's affidavit attests that Roechner said "he did not want another Black male," while in his deposition, Plaintiff did not testify that Roechner said that specific phrase. But that does not mean that the affidavit contains contradictory information; rather, the affidavit appears to supplement Plaintiff's testimony. *See, e.g.*, *Cook v. O'Neill*, 803 F.3d 296,

4

298 (7th Cir. 2015) ("Thede's affidavit was amplification rather than contradiction, and so was not within the 'sham' exclusionary rule.").

This Court now turns to the background facts, which it takes from Defendant's statement of facts (DSOF) [30], Plaintiff's response to Defendant's statement of facts (PRSOF) and statement of additional facts (PSAF) [48], and Defendant's response to Plaintiff's statement of additional facts (DRSAF) [71].

## I. City of Joliet Police Officer Hiring Process

Defendant City of Joliet's Board of Fire and Police Commissioners (Board) hires new City police officers. DSOF ¶ 1. The Board maintains a set of rules and regulations for recruiting, hiring, disciplining, and promoting employees in the City's police and fire departments. *Id.* ¶ 2. The City's police department also maintains general orders describing the hiring process. *Id.* ¶ 3.

Police officer applicants complete a written exam and oral interview; based on their scores, the department places them on an initial hiring eligibility list. *Id.* ¶ 4. Applicants can claim "preference points" for military experience, education, or prior law enforcement experience, which the department adds to their combined written and oral exam scores. *Id.* ¶ 5. Once final scores are set, the Board receives a final hiring eligibility list and signs off. *Id.* ¶ 6. This final eligibility list is effective for a finite period of time. *Id.* ¶ 7.

Before being hired, applicants must also undergo a psychological exam, background investigation, and polygraph. *Id.* ¶ 9. A third-party completes the psychological exam and polygraph, while the City's police department completes the

background investigation. *Id.* ¶ 10. When City Hall approves the hiring of additional officers, the Lieutenant of Investigations assigns the applicants' background investigations to detectives in numeric order. *Id.* ¶ 11. Ultimately, the Board meets and discusses applicants and votes whether to appoint them to open positions. *Id.* ¶ 15.

## II. Defendant Roechner

Roechner started working for the City's police department in July 1991. *Id.* ¶ 24. Roechner served as police commander from 2010 to 2014, and then as deputy chief of police from October 2014 to December 2018. *Id.* ¶ 25. After that, Roechner became interim chief of police under City Manager David Hales and then permanent police chief under Interim City Manager Marty Shanahan. *Id.* ¶ 26.

## III. Plaintiff's Application

Plaintiff applied to work for the City as a police officer twice—in 2012 and in 2018. *Id.* ¶ 17; PRSOF ¶ 17. The Board rejected Plaintiff's 2012 application. DSOF ¶ 20. After the Board rejected Plaintiff's application, Plaintiff worked with the Cicero Police Department for about eighteen months before being terminated. *Id.* ¶ 22.

Sometime in May 2019, after Plaintiff had applied to the City of Joliet for the second time, the Board posted a final police officer eligibility list, on which it ranked Plaintiff fifth out of 227 candidates. *Id.* ¶¶ 28, 29; PSAF ¶ 21. This means that his combined weighted score for the written portion of the test and the oral portion of the test (plus his preference points) constituted the fifth highest out of all applicants for the job. PSAF ¶ 21.

At the time the Board was considering Plaintiff's second application, the City was looking to hire ten individuals off of the list. DSOF ¶ 30. Lieutenant Joe Egizio served as the Lieutenant of Investigations in 2019 and assigned then-Detective Matlock and Detective Filipiak to conduct Plaintiff's background investigation. *Id.* ¶¶ 31, 32, 33. The background investigation revealed that Plaintiff had been fired from the Cicero Police Department and had been arrested for domestic battery. *Id.* ¶ 34. Lieutenant Egizio reviewed Plaintiff's background investigation synopsis with Chief Roechner, and Chief Roechner decided whether to recommend Plaintiff's hire to the Board. *Id.* ¶ 35.

Ultimately, Roechner signed a letter to the Board dated August 1, 2019, which stated: "I have reviewed the background investigation reports on Police Applicant Anthony Sinnott and do not recommend he be hired by the Joliet Police Department. Anthony has [sic] prior domestic battery arrest and was terminated from prior law enforcement agency." *Id.* ¶ 41. Roechner testified that he based his recommendation on Plaintiff's background which included two prior domestic arrests and being fired from his previous police department. [49-2] at 19. Roechner additionally testified that he believed Plaintiff attempted "deception or fraud" in his application; specifically, Roecher stated that Plaintiff in his 2019 application stated he was arrested only one time for domestic violence, but that in his prior application (from 2012) he stated he had been arrested twice. *Id.*

The Board met on August 21, 2019 and voted on Plaintiff's application. DSOF ¶ 48. The present Board members included Herb Lande, Carol Turney, and Todd

Wooten. *Id.* Roechner, Egizio, and then-Deputy Chief Darryl Gavin also attended this session. PSAF ¶ 26. In open session, the Board members voted to deny Plaintiff's application and the applications of Michael Davis, Jr., Amanda Reid, and Jeffrey Downs. DSOF ¶¶ 58–59. It is undisputed that the Board agrees with the police chief's recommendation for hiring at least 90% to 99% of the time. PSAF ¶ 19.

### IV. Comparators

At the same April 2019 meeting the Board rejected Plaintiff's application, it moved to appoint Andrew McCue, Thomas Rodeghier, Terrence Townsend, Jose Hernandez, Jason Banning, Daniel Barch, Anthony Hall, Sarah Miller, and Christopher Ucho. DSOF ¶ 68. None of these nine individuals are black. PSAF ¶ 30. Plaintiff ranked higher on the final eligibility list than seven of these nine individuals. *Id.* ¶ 31. The Board also subsequently moved to appoint Teresa Esqueda, Shanil Hopson, Brian Knabel, Bryan Kuzma, Matthew Larson, Yuliana Lopez, Ken Macejak, Lesly Sigala, and Nicholas Szalinski. DSOF ¶ 69.

Prior to his employment with the City, McCue (a Caucasian individual) was involved in a domestic incident with his girlfriend in 2013, which did not end in an arrest. *Id.* ¶ 72; PSAF ¶ 32. Several of the applicants named above admitted to prior use of marijuana. DSOF ¶ 73. Hernandez (a Hispanic individual) admitted to using k2 spice previously; his investigators also discovered that he was the subject of two separate police reports—one indicating that he had been involved in a verbal argument with his wife. *Id.* ¶ 74; PSAF ¶ 33.

Miller admitted she had taken food items without paying for them while working for Subway and the Heritage Bluff Golf Club. DSOF ¶ 75. The evaluator who passed Rodeghier noted in his psychological report that he had taken a video of a woman without permission, viewed pornography at work, masturbated at work, and had accidentally viewed bestiality. *Id.* ¶ 76. Macejak resigned from the Orland Police Department and, at the time appointed by the City, had been working for the Crestwood Police Department since November 2017. *Id.* ¶ 78. Kuzma had been arrested for a DUI but found not guilty. *Id.* ¶ 79. Szalinski had a use of force complaint filed against him while employed by the Romeoville Police Department, which Szalinski said had been ruled unfounded. *Id.* ¶ 80; PRSOF ¶ 80.

Plaintiff's brother, James Sinnott, is an employee for the Joliet Police Department and has worked there since 2013. PSAF ¶ 11. James belonged to the Joliet Black Police Officers Association (BPOA) at the time of Plaintiff's second application in 2018–2019. *Id.* Before Plaintiff applied for the job in 2018, he had attended approximately three to four BPOA events. *Id.* ¶ 14. The BPOA is an independent organization that aims to build a relationship between the police department and the community and meets with advocacy organizations such as the NAACP and National Hookup of Black Women. *Id.* ¶ 12. The Joliet BPOA has earned awards in the community and nationally with regard to its service in the community. *Id.* ¶ 13.

9

In 2019, the Joliet police department employed 328 people; of those, 30 were black. *Id.* ¶ 20. It is undisputed that the City has hired applicants with arrests for domestic battery in the past; these applicants are Caucasian. *Id.* ¶ 34.

### V. Alleged Racial Discrimination

According to Plaintiff, as part of the hiring process for his 2018 application, between approximately fall of 2018 and March 2019, he attended an orientation session at Joliet high school. [49-16] ¶ 3. There, Carlos Matlock (then a Detective with the Joliet police department) introduced Plaintiff to Roechner. *Id.* ¶ 4. Plaintiff attests that, after being introduced to Roechner, he overheard Roechner say to the officer standing next to him "that he did not want another Black male so that they [the Joliet Police Department] could have another member of the BPOA." *Id.* ¶ 5. Roechner denies ever making this statement. DRSAF ¶ 18. Former Board member Todd Wooten testified that the term "shithead" was "essentially another kind of slang derogatory term for African-Americans" within the Joliet police department and that he had on "several occasions" heard Roechner use that term. [49] at 57, 59.[1]

---

[1] Plaintiff also asserts that Roechner has used the n-word. PSAF ¶ 9. The evidence he uses to support this assertion, however, is inadmissible. It consists of former Board member Todd Wooten's testimony that he has "had people tell me that that's how [Roechner] rolls" and "am I aware of the fact that this kind of stuff goes on and have those kind of accusations been made about Chief Roechner? Yes." [49] at 56–57. Wooten lacks personal knowledge of these alleged statements; they also constitute inadmissible hearsay. *See Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454–55 (7th Cir. 2015) (holding that an affidavit held "no weight" because the affiant's statements that an employer's actions were discriminatory and retaliatory were not based on personal knowledge); Fed. R. Evid. 801, 802.

### VI. Plaintiff's Claims

Plaintiff brings a three-count complaint to redress Defendants' allegedly unlawful refusal to hire him as a police officer. Count I alleges disparate treatment in violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights (IHRA) against the City; Count II brings claims against the City and Roechner under: 42 U.S.C. § 1981 for race discrimination, 42 U.S.C. § 1983 for race discrimination in violation of the equal protection clause of the Fourteenth Amendment, and Section 1983 for violating Plaintiff's right to free association under the First Amendment; and Count III alleges that the City violated the Illinois FOIA by improperly redacting documents in response to Plaintiff's FOIA requests. [1]. Defendant has moved for summary judgment on all claims. [33]. In his response, Plaintiff makes no attempt to defend his FOIA claim and thus has abandoned it. *See generally* [50]; *see Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 (7th Cir. 2020) (noting that the district court appropriately deemed a claim abandoned where the plaintiff failed to defend the claim in opposition to the defendants' motion for summary judgment). This Court therefore grants summary judgment on Count III and will address only the remaining claims.

### ANALYSIS

### I.    Race Discrimination

The Court begins with Plaintiff's discrimination claims under Title VII, the IHRA, Section 1981, and Section 1983 for equal protection violations. The legal

standard is the same for all of these claims. *See Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (observing that the "legal standard is the same under" Title VII, Section 1981, and the IHRA); *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) ("We evaluate discrimination claims brought under both Title VII and § 1983 using the same standard.").

Plaintiff may defeat summary judgment by proceeding under one or two cognizable frameworks for evaluating discrimination claims. First, Plaintiff may proceed under the burden-shifting framework the Supreme Court developed in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). In the failure to hire context under *McDonnell Douglas*, a plaintiff establishes a prima facie case by showing that: (1) he was a member of a protected class; (2) he was qualified for and applied to an open position; (3) he was rejected; and (4) the employer filled the position by hiring someone outside the protected class, or left the position open. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021); *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; assuming the employer does so, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)). That the "individuals ultimately hired were better candidates" constitutes a legitimate, nondiscriminatory reason for

12

refusing to hire a plaintiff. *Marnocha*, 986 F.3d at 721; *see also Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. *See Palmer v. Ind. Univ.*, 31 F.4th 583, 589 (7th Cir. 2022). Under *Ortiz*, this Court asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016); *see also Nigro v. Ind. Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022). Under *Ortiz*, courts assess the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Lewis*, 36 F.4th at 760. The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766).

Here, because the parties evaluate Plaintiff's failure to hire claims under both frameworks, this Court will, too.

### A.    *McDonnell Douglas*

Under *McDonnell Douglas*, the parties do not dispute the first and third elements of Plaintiff's prima facie case—that Plaintiff belongs to a protected class (element 1) and that the City did not hire him (element 3). *See* [33] at 5, 6. Instead, the parties dispute whether Plaintiff has offered sufficient evidence on the remaining elements to withstand summary judgment. This Court concludes he does.

13

On the second element, Defendants argue that Plaintiff's background investigation revealing his past arrests for domestic battery and termination from his prior law enforcement position rendered him unqualified for the position. [33] at 5. Yet, as Plaintiff points out, there is sufficient evidence that despite his prior record, (1) he possessed the qualifications to serve in the position; and (2) his background should not have rendered him unqualified.

First, Plaintiff adduces evidence that he scored better than the majority of applicants, including those the City ultimately hired. Indeed, at the same time it rejected Plaintiff's application, the City hired nine individuals—Andrew McCue, Thomas Rodeghier, Terrence Townsend, Jose Hernandez, Jason Banning, Daniel Barch, Anthony Hall, Sarah Miller, and Christopher Ucho—none of whom are black and seven of whom ranked lower on the Board's final eligibility list than Plaintiff. DSOF ¶ 68; PSAF ¶¶ 30, 31. When the Board posted a final police officer eligibility list in May 2019, it ranked Plaintiff fifth out of 227 candidates. PSAF ¶ 21. This means Plaintiff's combined weighted score for the written portion of the test and the oral portion of the test (plus his preference points) constituted the fifth highest out of all applicants for the job. *Id.*

Moreover, although Defendant contends that Plaintiff's background precluded him from qualifying for the role, a reasonable jury could find that Plaintiff was qualified in spite of his background. The record shows that the City hired other applicants with imperfect backgrounds, including backgrounds with domestic incidents. One individual the City hired, McCue, was involved in a domestic incident

with his girlfriend in 2013. PSAF ¶ 32. Another, Hernandez, showed up in two separate police reports—one indicating he had been involved in a verbal argument with his wife. PSAF ¶ 33. The City also hired other applicants with issues in their background checks. It hired Miller, who admitted to stealing food from her previous employers without paying; and it hired Rodeghier, who had taken a video of a woman without permission, viewed pornography at work, masturbated at work, and had accidentally viewed bestiality. DSOF ¶¶ 75, 76. Kuzma had been arrested for a DUI but found not guilty. *Id.* ¶ 79. Szalinski had a use of force complaint filed against him while employed by the Romeoville Police Department, which Szalinski said had been ruled unfounded. *Id.* ¶ 80; PSOF ¶ 80. Viewing the record in Plaintiff's favor, a jury could reasonably conclude that Plaintiff was qualified for the officer position in spite of his prior background.

Defendants also argue that there is insufficient evidence on the fourth element of the prima facie test, which requires Plaintiff to prove that the City filled the position by hiring someone outside the protected class or left the position open. *Marnocha*, 986 F.3d at 721. On this point, however, is undisputed that, at the same time the Board rejected Plaintiff's application, it hired nine other candidates, none of whom were African American. DSOF ¶ 68. Defendants argue that Roechner recommended—and the Board approved—an African American hire shortly after the Board rejected Plaintiff, *see* [33] at 6, but that ignores that at the time it rejected Plaintiff, the Board hired nine non-African American officers, most of whom the Board placed lower on their final eligibility list. A "singular instance of [the

City] hiring a black [police officer] . . . does not entitle [the City] to immunity from subsequent discrimination allegations." *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014) (holding that the district court committed an "egregious" error by giving weight to the fact that the employer hired another African-American employee around the time of the plaintiff's pending application). Accordingly, Plaintiff has presented sufficient evidence on the fourth prima facie element as well.

Because Plaintiff has met his prima facie burden, the burden then shifts to Defendants to offer a nondiscriminatory motive; if they do, the burden shifts back to Plaintiff to show that Defendants' proffered reason for refusing to hire him was pretextual. *Igasaki*, 988 F.3d at 957. Here, Defendants offer a nondiscriminatory reason for not hiring Plaintiff—his prior domestic incidents and termination from another law enforcement agency. Plaintiff, however, offers evidence that this reason is pretextual. In the context of employment discrimination, pretext "means a lie, specifically, a phony reason for some action." *Chatman*, 5 F.4th at 746 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). Plaintiff's circumstantial evidence of pretext comes from, as discussed above, the fact that Defendant hired non-African American candidates, some of whom had spotty backgrounds like Plaintiff, and most of whom scored below Plaintiff on the Board's final eligibility list.

More importantly, under the cat's paw theory of liability, an inference of discriminatory intent arises where a "subordinate without decision-making authority has such influence over the decisionmaker that she is able to use her discriminatory actions to manipulate the decisionmaker into taking the adverse employment action."

16

*Brooks v. Avancez*, 39 F.4th 424, 439 (7th Cir. 2022). To prevail on a cat's paw theory, Plaintiff must show both that the subordinate "actually harbored discriminatory animus against him" and that the subordinate's input proximately caused the City's refusal to hire Plaintiff. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). Plaintiff has evidence of both elements. First, Plaintiff offers evidence—in the form of his sworn declaration—that he attended in orientation at a Joliet high school as part of the hiring process for his 2018 application, and that during that event, Plaintiff overheard Roechner say to the officer standing next to him "that he did not want another Black male so that they [the Joliet Police Department] could have another member of the BPOA." [49-16] ¶ 5. In his deposition, Board member Todd Wooten testified that the term "shithead" was "essentially another kind of slang derogatory term for African-Americans" within the Joliet police department and that he had on "several occasions" heard Roechner use that term. [49] at 57, 59. A jury could find from these pieces of evidence that Roechner harbored a discriminatory animus against Plaintiff. *See, e.g.*, *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 935 (7th Cir. 2020) (holding that the district court erred by dismissing evidence of sex-role stereotyping as mere "stray remarks" that were not probative of unlawful intent in a hiring decision). Moreover, there is evidence that Roechner proximately caused the Board to refuse to hire Plaintiff: it is undisputed that the Board goes with the police chief's recommendations at least 90% to 99% of the time. PSAF ¶ 19. Based on this record, a rational jury could find that the Board refused to

17

hire Plaintiff for discriminatory reasons and that Defendants' stated reason for not hiring Plaintiff was pretext for illegal discrimination.

In sum, Plaintiff has presented sufficient evidence under the *McDonnell Douglas* burden-shifting analysis to withstand summary judgment on his race discrimination claims.

### B. *Ortiz*

Under *Ortiz*'s approach to view the evidence holistically, this Court similarly concludes that Plaintiff created a triable issue of fact on his discrimination claims under Title VII, the IHRA, Section 1981, and Section 1983. Defendants insist that Plaintiff's background investigation—revealing, among other things, the two domestic violence incidents—rendered Plaintiff unqualified for the job. But Plaintiff has offered sufficient evidence of illegal animus. As discussed, Plaintiff states in his declaration that he heard Roechner say, during the hiring process, "that he did not want another Black male so that they [the Joliet Police Department] could have another member of the BPOA." [49-16] ¶ 5. And Plaintiff has offered evidence of other non-African American candidates who the City hired, even though some of them had blemished background checks and most of them ranked below Plaintiff on the final eligibility list. Viewed as a whole, the record permits a reasonable factfinder to conclude that Plaintiff's race caused Defendants' refusal to hire. *Ortiz*, 834 F.3d at 765.

This Court thus denies summary judgment on Plaintiff's discrimination claims under Title VII, the IHRA, Section 1981, and Section 1983.

## II.    First Amendment Claim

Defendants also move for summary judgment on Plaintiff's First Amendment claim in Count II. Plaintiff's First Amendment theory posits that Defendants denied him employment in retaliation for "his activities, connections, and association with members of the BPOA." [50] at 13.

To prevail on this claim, Plaintiff must prove the following three elements: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" for the defendants' decision to retaliate. *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021), *cert. denied*, 141 S. Ct. 2724 (2021). Plaintiff's claim fails as a matter of law on the first element.

While the freedom of expressive association is a well-recognized First Amendment right, *see Bennett v. Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 991 F.3d 724, 733 (7th Cir. 2021), in the public employment context, Plaintiff is "protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern." *Lett v. City of Chicago*, No. 18-CV-4993, 2019 WL 1200609, at *5 (N.D. Ill. Mar. 14, 2019) (first quoting *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999); then citing *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005)), *aff'd*, 946 F.3d 398 (7th Cir. 2020). Associational activity relates to a matter of public concern only where the individual is "associating

to promote an idea" or his "conduct was meant to call attention to an issue of public concern." *DeGroot v. Village of Matteson*, No. 13 C 8530, 2014 WL 5156703, at *3 (N.D. Ill. Oct. 14, 2014) (quoting *Klug*, 197 F.3d at 858).

Plaintiff's associational conduct does not relate to a matter of public concern. In *DeGroot*, a case with similar facts, the plaintiff alleged that he received a conditional offer of employment for a firefighter position from the Village of Matteson, but later, the Village withdrew its offer and discontinued the firefighter hiring process. 2014 WL 5156703, at *2. The plaintiff sued, asserting that the Village did so in retaliation for his association with the Firefighters' Pension Fund Board of Trustees which had ongoing conflict with the Village. *Id.* The district court dismissed the plaintiff's First Amendment retaliation claim, reasoning that the plaintiff's associational conduct concerned his "potential employment as a firefighter, and thus [was] a personal matter of interest only to him" and not related to a public concern. *Id.* at *3.

So too here. As in *DeGroot*, Plaintiff asserts that Defendants refused to hire him due to his affiliation with the BPOA. And as the undisputed portions of the record show, Plaintiff's association with BPOA "was as a prospective employee, which is a personal pursuit of employment," not a matter of public concern. *DeGroot*, 2014 WL 5156703, at *3. Indeed, while there exists evidence that he attended three or four BPOA meetings, *see* PSAF ¶ 14, there is no evidence that he did so "to promote an idea" or "to call attention to an issue of public concern," *DeGroot*, 2014 WL 5156703, at *3; *see also, e.g.*, *Caffarello v. Ill. State Toll Highway Auth.*, No. 13 C 8495, 2014

WL 3559388, at *6 (N.D. Ill. July 17, 2014) (First Amendment association claim brought by a public employee dismissed where the complaint failed to allege that purpose of "Plaintiff's associational conduct was to bring any alleged wrongdoing to light"). Thus, Plaintiff did not engage in associational conduct protected by the First Amendment. For this reason, his First Amendment claim fails as a matter of law. This Court grants summary judgment to Defendants on Plaintiff's First Amendment claim.

### III.    Fourteenth Amendment Freedom of Association

Finally, in his response to Defendants' motion for summary judgment, Plaintiff invokes a theory, for the first time, that Defendants violated his Fourteenth Amendment due process right to freedom of intimate association. [50] at 14. Plaintiff argues that, by not hiring him, Defendants "directly and substantially interfered with Plaintiff's right to associate with his brother." *Id.* Even assuming a legal basis for this claim in this context, it fails as a matter of law.

As Defendants argue, Plaintiff did not allege this claim in his complaint and never sought leave to do so. [72]. Plaintiff raised only a Fourteenth Amendment equal protection claim; the right to freedom of intimate association, in contrast, arises from the due process clause's protection of personal liberty. *See* [1] ¶ 54; *see Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005). Plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 800 (7th Cir.

2018) (quoting *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)). Thus, this Court grants summary judgment to Defendants on this claim.

## CONCLUSION

For the reasons explained above, this Court grants in part and denies in part Defendants' motion for summary judgment [29]. As a result of this Court's rulings, only Plaintiff's race discrimination claims under Title VII, the IHRA, the Fourteenth Amendment's equal protection clause, Section 1981, and Section 1983 stand.

Dated: January 24, 2023

Entered:

Mary M Rowland

Mary M. Rowland
United States District Judge